**BERGER & MONTAGUE, P.C.**
Russell D. Paul (PA Bar No. 71220)
William H. Ellerbe (PA Bar No. 319170)
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: rpaul@bm.net
Email: wellerbe@bm.net
*Motion for Pro Hac Vice Admission to be filed*

**Phillip Paul Weidner & Associates, APC**
Phillip Paul Weidner (AK Bar No. 7305032)
Lisa Rosano (AK Bar No. 511110)
943 West Sixth Avenue
Suite 300
Anchorage, AK 99501
Tel: (907) 277-7000
Fax: (907) 278-6571
Email: pweidner@weidnerjustice.com
Email: lrosano@weidnerjustice.com

*Attorneys for Relator*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel*. THOMAS FIDLER, <br><br> Plaintiffs, <br><br> v. <br><br> ALASKA NEUROLOGY CLINIC, LLC, and FRANK ELLENSON, M.D. <br><br> Defendants. | CASE NO.:_____ <br><br> **COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.*, AND THE ALASKA MEDICAL ASSISTANCE FALSE CLAIM AND REPORTING ACT, AS 09.58.010 *ET SEQ*.** <br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) (1986, AS AMENDED)** <br><br> **JURY TRIAL DEMANDED** |

<h1 style="text-align:center">Table of Contents</h1>

I.   Summary Of The Action ........................................................................................1

II.  The Parties ................................................................................................. 2

III. Jurisdiction And Venue ............................................................................. 5

IV. Applicable Law .......................................................................................... 6

    A.  The False Claims Act ............................................................................ 6

    B.  Claims Submission and Certifications ................................................. 7

    C.  The Anti-Kickback Statute ................................................................. 10

        1.  Violating the Anti-Kickback Statute Results in FCA Liability...................... 12

V.  The False Claims ...................................................................................... 13

    A.  Submitting Claims with False Dates of Service ................................. 13

    B.  Submitting Claims with False Procedure and Diagnosis Codes ....................... 18

    C.  Submitting Claims with a False Provider of Services ............................ 21

    D.  Upcoding Massage to Physical Therapy ............................................. 24

    E.  Waiving Copays for Infusion Treatments .......................................... 25

    F.  Submitting Claims for Infusions Performed Without Physician Supervision................... 26

VI. Defendants Submits The False Claims Knowingly ............................... 27

VII. Defendants Knowingly Fail To Report And Return Overpayments  To The Government... 29

VIII. Defendants' False Claims Caused Injury And Damages To The Government .................. 30

IX. Counts ...................................................................................................... 30

    A.  Count I, Violation of 31 U.S.C. § 3729(a)(1)(A) ............................... 30

    B.  Count II, Violation of 31 U.S.C. § 3729(a)(1)(B) .............................. 31

    C.  Count III, Violation of 31 U.S.C. § 3729(a)(1)(G) ............................ 31

    D.  Count IV, Violation of 31 U.S.C. § 3729(a)(1)(A) based on violations of the The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b ................................ 32

    E.  Count IV, Violation of AS 09.58.010(a) ........................................... 33

X.  Prayer For Relief ..................................................................................... 33

XI. Demand For Jury Trial Pursuant To Federal Rule Of Civil Procedure 38(B)...................... 34

Thomas Fidler ("Relator"), on behalf of the United States of America and the State of Alaska ("Alaska" or the "State"), brings this action against Alaska Neurology Clinic, LLC and Dr. Frank Ellenson ("Dr. Ellenson") (collectively, "Defendants") for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, and the Alaska Medical Assistance False Claim and Reporting Act, AS 09.58.010 *et seq.*, to recover all damages, civil penalties, and all other recoveries.

## I.    SUMMARY OF THE ACTION

1.    From at least 2008 to the present, Alaska Neurology Clinic, LLC ("AKNC") has submitted false claims for reimbursement for services it provides to its patients to Medicare, Alaska's Medicaid program, TRICARE, the Veteran's Administration, and other federally and state funded health care programs ("government payers" or "government health care programs"). AKNC, through its billing staff, regularly falsifies its claims, especially when the claims are initially denied, to ensure that its claims are paid by government payers even when AKNC by law is not entitled to payment.

2.    AKNC uses a variety of fraudulent schemes to create false claims to boost its revenues from government payers.  Among AKNC's schemes are (a) falsifying dates of service on claims; (b) falsifying procedure and diagnosis codes on claims; (c) billing under the name and NPI numbers of providers who did not perform the service; (d) upcoding massage therapy to physical therapy because most government payers, including Medicare and Medicaid, do not cover massage therapy.

3.    In these instances, AKNC either creates the false claims it submits because its original, accurate claims were rejected, or because it knows from experience that a claim will be rejected if submitted with accurate information.

1

4.      AKNC also waives the Medicare co-insurance payment requirements ("copayments") for its patients who receive Tysabri infusions, which are very expensive.  AKNC waives these copayments to incentivize patients to come to AKNC to receive these services, which constitutes a kickback for its patients who are insured by a government payer in violation of the Anti-Kickback Statute.

5.      AKNC also evades the Alaska State Medical Board's Guidelines by having medical assistants independently run its infusion practice without any direct supervision by a physician, leading to AKNC submitting false claims every time a patient insured by a government payer receives an infusion at AKNC.

6.      As the sole owner of AKNC and a practitioner there, Dr. Ellenson has knowledge of the schemes described above.  The fact that AKNC's former Operations Manager and its current Billing Supervisor instructed their subordinates to falsely substitute Dr. Ellenson on claims that are actually provided by other clinicians who are not approved by certain government payers shows that Dr. Ellenson either knows of the frauds being perpetrated in his name, acts with deliberate ignorance as to truth or falsity of these claims, or acts in reckless disregard of the truth or falsity of these claims.  He is certainly enriched by these frauds, as he is the sole owner of AKNC, which has become a thriving business, in part due to its rampant and egregious practice of submitting false claims.

## II.     <u>THE PARTIES</u>

7.      The United States is a plaintiff in this action, which it brings on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded healthcare programs, including Medicare, Medicaid, TRICARE, and the Veterans Administration.

8.      Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395ggg; 42 U.S.C. §§ 426 and 426A, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program. Medicare is a government health insurance program for people age 65 or older, certain disabled people under age 65, and people of all ages with end stage renal disease.  The Medicare Program is comprised of four parts; Medicare Parts A through D.

9.      Part A of the Medicare program authorizes payment for institutional care, including hospital, skilled nursing facility, and home health care.

10.     Medicare Part B, which is particularly relevant to the allegations raised herein, authorizes payment for physician and ancillary services, including laboratory and diagnostic tests and procedures. Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. CMS contracts with private insurance companies to administer, process, and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund. The private insurance companies that contract with CMS  to provide these services are called Part B Carriers.

11.     Part C of the Medicare program is also known as Medicare Advantage. Medicare Advantage Plans stand in place of Medicare Parts A and B and are offered by private companies approved by Medicare. These plans are typically less expensive for the consumer, but limit covered beneficiaries to a network of covered  providers.

12.     Medicare Part D provides prescription drug coverage for Medicare beneficiaries.

13.     TRICARE is a federally funded program providing medical benefits to military personnel, their families, retired veterans, and reservists called to duty. *See* 32 C.F.R. § 19 *et seq*.

14.     The Veterans Administration is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

15. Medicaid is a government health insurance program funded jointly by the Federal and State governments. *See* 42 U.S.C. § 1396 *et seq.* Each State administers its own Medicaid program. However, each State program is governed by Federal statutes, regulations andguidelines. The federal portion of each State's Medicaid payment – the Federal Medical Assistance Percentage – is based on that State's per capita income compared to the national average. During the relevant time period, the Federal Medical Assistance Percentage was between approximately 50% and 80%.

16. The State of Alaska is a plaintiff in this action. AKNC is located in Anchorage, Alaska and provided services to Alaska residents, including to Medicaid beneficiaries who reside in Alaska.

17. Relator Thomas Fidler is a citizen of the United States and a resident of Alaska. Relator is a graduate of the University of Alaska. Relator is an information technology ("IT") professional. Relator first began working at AKNC as a contracted employee serving as an IT technician in 2013. In January, 2016, he was offered the position of IT manager. He was then promoted to Director of IT in March 2017, a role in which he served until November 7, 2017.

18. Defendant AKNC is a privately owned medical clinic located at 1100 E. Dimond Boulevard, Anchorage, Alaska 99515. AKNC is organized as a limited liability company. AKNC specializes in the diagnosis and treatment of conditions affecting the brain, spine, and nervous systems.

19. Defendant Dr. Frank Ellenson is the sole owner and member of Defendant Alaska Neurology Clinic, LLC. He also treats patients in his capacity as a physician at AKNC. Dr. Ellenson, in his capacity as owner of AKNC, is responsible for AKNC's billing practices.

4

US *EX REL.* FIDLER V. ALASKA NEUROLOGY CLINIC, LLC, CASE NO. _____
Case 3:18-cv-00057-HRH   Document 1   Filed 02/26/18   Page 6 of 37

### III.  JURISDICTION AND VENUE

20.     Subject matter jurisdiction is founded upon the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

21.     Venue in the District of Alaska is appropriate under 31 U.S.C. § 3723(a) in that, at all times material to this civil action, Defendants transacted business in the District of Alaska, or submitted or caused the submission of false claims in the District of Alaska.  Although such issue is no longer jurisdictional under the 2010 amendments to the Act, to Relator's knowledge, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e).  Moreover, whether or not such a disclosure has occurred, Relator would qualify under that section of the Act as an "original source" of the allegations in this Complaint.  Before filing this action, Relator voluntarily disclosed and provided to the Government the information on which the allegations or transactions in this action are based.  Additionally, Relator has knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may prove to have occurred without his knowledge.

22.     This Court further has supplemental jurisdiction as to claims by the State of Alaska against Defendants for violations of the Alaska Medical Assistance False Claim and Reporting Act (the "Alaska FCA"), AS 09.58.010 *et seq.*, pursuant to 28 U.S.C. § 1367, as those claims are related to the federal claims in that they form part of the same case and controversy under Article III of the United States Constitution and as further contemplated by 31 U.S.C. § 3732(b).

## IV.   APPLICABLE LAW

### A.   The False Claims Act

23.    The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, provides, inter alia, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. §§ 3729(a)(1)(A)–(B).

24.    The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §§ 3729(b)(1)(A)(i)–(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

25.    The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. §§ 3729(b)(2)(A)(i)–(ii).

26.    "The term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

27.     The Alaska FCA is modeled after the FCA, and it contains provisions similar to those quoted above.  Relator asserts claims under the Alaska FCA for the State portion of Medicaid false claims detailed in this Complaint.

28.     Services provided to Medicare and other federal health care program beneficiaries are only reimbursable if they are medically necessary. *See* 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under part A or part B of this subchapter for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member"); 42 C.F.R. § 411.15(k)(1).  That is, Medicare and other federal health care programs only cover medical services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." *Id*.; *see Strand Analytical Labs, LLC v. Burwell*, 2015 WL 4603258, at *15 (S.D. Ind. July 30, 2015) (court upheld denial of coverage for defendant lab's test because it was not reasonable and necessary for the diagnosis or treatment of an illness).

29.     Accordingly, providers may only submit claims for government healthcare reimbursement for "reasonable and necessary" medical services.

**B.**     **Claims Submission and Certifications**

30.     Each time a claim for payment is submitted to the government, a provider expressly certifies that the services performed were medically justified and the claim otherwise complies with applicable rules and regulations.

31.     Providers submit claims to Medicare for reimbursement for medical services and equipment by using CMS Form 1500.  Most claims are filed electronically.  The claim form has different numbered fields that the provider must fill in such as the patient's name, address, insured's I.D. number, referring physician's name and patient's diagnosis.

32.     When submitting claims on CMS Form 1500, providers indicate the type of service provided to a Medicare or Medicaid beneficiary using a code known as a Healthcare Common Procedure Coding System ("HCPCS") code, which arc sometimes referred to by their private practice counterpart, Current Procedural Terminology ("CPT") codes. *See generally* 45 C.F.R. § 162.1002; *United States ex rel. Sikkenga  Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 709 n.9 (10th Cir. 2006) ("CPT codes refer to 'Current Procedural Technology' codes, which describe medical services such as treatments, tests, and procedures, and are an accepted means of reporting such medical services to government and health insurance programs.").

33.     CPT codes are published annually by the American Medical Association ("AMA") in a CPT Manual and are composed of a five digit numeric codes (which sometimes include a numeric modifier) used to describe procedures, services and supplies.  CMS has adopted the AMA's CPT coding system as part of its HCPCS coding system.

34.     Form 1500 also requires the provider to list all CPT/HCPCS codes for the medical services provided (field number 24D on the claim form).

35.     When submitting claims on CMS Form 1500, providers also must provide their national provider identifier ("NPI") number, which is a "standard unique health identifier for health care providers." 45 CFR § 162.406; *see United States v. Gonzalez*, 560 F. App'x 554, 556 (6th Cir. 2014) (describing NPI as "unique identifiers issued by the [CMS] to healthcare providers").

36.     The provider must sign the form (field number 31) and attest to the certifications found on the reverse side of CMS Form 1500.

37.     These certifications include the following relevant statements:

**SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)**

8

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license#, or SSN) of the primary individual rendering each service is reported in the designated section.

CMS Form 1500.

38.     Thus, the form specifically contains a "medical necessity" certification and a certification that the claim complies with all applicable rules and regulations.

39.     Also, the provider must certify that all the information on the form is true, accurate, and complete.

40.     In addition to these express certifications and representations, when submitting claims for government reimbursement, providers impliedly certify that the underlying services were medically necessary and otherwise comply with applicable rules and regulations. *See United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir. 2010) ("[T]hrough the act of submitting a claim, [providers] knowingly and falsely implied that [they were] entitled to payment.").

41.     Knowingly causing the submission of claims that are ineligible for payment under a federal health care program constitutes a violation of the FCA. *See United States ex. rel.*

*Franklin v. Parke-Davis*, 147 F. Supp. 147, 152–53 (D. Mass. 2001) (knowingly causing the submission of claims that are ineligible for reimbursement can serve as a basis for liability under the FCA); *see also United States ex rel. Nowak v. Medtronic, Inc.*, Case Nos. 1:08-cv-10368 and 09-cv-11625 (D. Mass.) (United States' Statement of Interest, at 6)("[t]o the extent that a healthcare provider seeks reimbursement for a procedure that is ineligible for payment under a federal healthcare program . . . because the program places other conditions on coverage that are not satisfied, the claim is false").

42.      Thus, each time a claim for payment is submitted to a Federal healthcare program, the provider expressly certifies that the services performed were medically justified.  In addition, each time a provider submits a claim, the provider impliedly certifies that the service was provided in accordance with Federal and State statutes, regulations, and program rules

43.      When submitting CMS Form 1500, providers must also agree to the following certification: "I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction."

44.      Consequently, a submitting provider who does not personally provide services or personally direct the provision of services may not submit a claim for reimbursement.

### C.      The Anti-Kickback Statute

45.      The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, makes it a criminal offense to "knowingly and willfully" offer, pay, solicit, or receive any remuneration to induce, or in return for, referrals of items or services paid for by a Federal health care program. If any purpose of the remuneration is to induce or reward the referral or recommendation of

US *EX REL.* FIDLER V. ALASKA NEUROLOGY CLINIC, LLC, CASE NO. _____

business payable in whole or in part by a federal health care program, the AKS is violated, i.e., a lawful purpose will not legitimize a remuneration that also has an unlawful purpose.

46.     Specifically, the AKS provides:

(1)     whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A)     in return for referring an individual to a person for the furnishing or arranging of any item or service for which payment may be made in whole or in part under a Federal health care program. . . .

(B)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program

*   *   *

(2)     whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A)     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

(B)     to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b).

47.     Specific intent is not required to establish a violation of the AKS. That is, "a person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [the AKS]." 42 U.S.C. § 1320(a)-7b(h)).

48.     A "Federal health care program" is defined at 42 U.S.C. § 1320a-7b(f) as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government.  The Anti-Kickback Statute applies to funds received by Defendants from Medicare.

49.     Violation of the statute can subject the perpetrator to exclusion from participation in federal healthcare programs and civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

50.     None of the "safe harbors" to the AKS are applicable here.  *See* 42 C.F.R. § 1001.952.

### 1.     Violating the Anti-Kickback Statute Results in FCA Liability

51.     Congress has long viewed the elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. *See United States v. Greber*, 760 F.2d 68, 70–71 (3d Cir. 1985). To protect against the erosion of patient care and patient safety, courts uniformly agree that compliance with the AKS is a material condition of payment under Medicare.[1]

52.     Moreover, these and other courts have held that a person or entity who violates the AKS and submits a claim or causes another to do so has violated the False Claims Act regardless of what form the claim or statement takes.  Many of these courts have reasoned that

---

[1]  *See United States et al. ex rel. Westmoreland v. Amgen Inc.*, 2011 U.S. App. LEXIS 15036 (1st Cir. July 22, 2011); *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 2011 U.S. App. LEXIS 10972 (1st Cir. June 1, 2011); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004); *United States ex rel. Conner v. Salina Regional Health Ctr.,* 543 F.3d 1211, 1223 n.8 (10th Cir. 2008); *United States ex rel. McNutt v. Haleyville Medical Supplies,* 423 F.3d 1256, 1259–1260 (11th Cir. 2005); *United States v. Rogan*, 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).

US *EX REL.* FIDLER V. ALASKA NEUROLOGY CLINIC, LLC, CASE NO. _____

the claims are false, and thus violate the FCA, because there is a false certification – either

express or implied – as to compliance with the AKS each time a claim is submitted.[2]

53.     More recently, in 2010, under the Patient Protection and Affordable Care Act,

Congress amended the AKS to expressly clarify that a violation of the AKS constitutes a "false

or fraudulent" claim under the False Claims Act.  (42 U.S.C. § 1320(a)-7b(g)).  This clarifying

amendment was consistent with prior Congressional intent and case law, as cited above.

## V.     THE FALSE CLAIMS

### A.     Submitting Claims with False Dates of Service

54.     AKNC, through its billing managers and personnel, regularly change the date of

service on claims in an effort to deceive a government health insurance program payer into

paying the claim.

55.     AKNC often changes the dates of service on a claim after a claim with the correct

date of service has been rejected by the government payer.  AKNC's strategy of changing the

date of service on a claim is specifically aimed at circumventing a denial and ensuring that a

denied claim gets paid even though AKNC knows, because the payer has already rejected the

claim, that it should not be paid.

---

[2]  *See*, *e.g.*, *United States v. Rogan,* 157 F.3d 449, 452 (7th Cir. 2008); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 245 (3d Cir. 2004); *Mason v. Medline Industries, Inc.*, 2010 WL 653542, at *5–9 (N.D. Ill. Feb. 18 2010); *United States ex rel. Jamison v. McKesson Corp.*, 2009 WL 3176168 (N.D. Miss. Sept. 29, 2009); *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 12, 17–18 (D. Mass. 2007); *United States ex rel Bidani v. Lewis*, 264 F. Supp. 2d 612, 615–16; *United States ex rel. Franklin v. Parke-Davis* 2003 WL 20048255 (D. Mass. Aug. 22, 2003); *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 238 F. Supp. 2d 258, 264 (D.D.C. 2002); and *United States ex rel. Bartlett v. Tyrone Hospital, Inc.*, 234 F.R.D. 113, 121 (W.D. Pa. 2001).

56.     In other cases, once AKNC learns that certain submitted claims are impermissible because of the payer's policies—for instance, that Medicaid refuses to pay for more than a certain daily maximum of hours for a specific service per patient per day—it will intentionally create entirely fictitious new claims for services in the first instance by dividing a single date of service into separate claims for multiple dates of service so that each of those separate claims will then be accepted and paid.

57.     For instance, on June 4, 2014, the person with control of AKNC's main billing email account billing@prodigymd.com (who Relator believes was Raquel Lehrmann at the time), wrote a response email to her husband Eli Lehrmann, AKNC's Operations Manager. Eli Lehrmann's earlier email had listed a number of billing issues, including one regarding a claim for a service on February 4, 2014 that Medicare had denied because the service had exceeded the daily maximum number of hours. Raquel Lehrmann's response, in bold red typeface, instructs him to create an entirely fictitious claim with a date of service on the next day for the excess over the daily maximum on February 4, 2014:



1005927--MEDICARE DENIED DOS 02/04/14 96118 FOR # OF UNITS EXCEEDS MAX ALLOWABLE. I CALLED MEDICARE TO TRY AND GET WHAT THE MAX ALLOWABLE WAS AND BECAUSE THIS INFORMATION IS NOT PUBLISHED I HAD TO FAX A FORM TO THEM AND RQST THIS INFO. I WILL LET YOU KNOW WHEN THEY SEND THE INQUIARY BACK ITS 8 PER DAY I BELIEVE, SO WHAT WE NEED TO DO IS CHANGE THE UNITS TO 8 ON THAT DATE AND CREATE ANOTHER CLAIM FOR THE REMAINDER OF THE UNITS ON THE NEXT DAY....SEND ME THE DETAILS AND I WILL CREATE THE CLAIMS FOR YOU

58.     Similarly, on February 13, 2017, Shawna Paquin, AKNC's Billing Supervisor, sent an email to a group of seven members of her staff titled "Weekly Meeting Recap 02/09/2017". In this email, Paquin instructed the recipients how to create false claims to ensure that Medicaid would pay on a claim for a certain psychological/neuropsychological test with the CPT code of 96118 even if the claim exceeded the daily maximum number of hours for that test:

US *EX REL.* FIDLER V. ALASKA NEUROLOGY CLINIC, LLC, CASE NO. _____



(highlighted portion reads, "Medicaid does not pay for 96119. They do pay for 96118 with an annual max of 12 units, however, there is an 8 unit daily maximum. So we will not be appealing the claims that paid the 8 units and denied the 4 on the same DOS. Instead, move units to the next day and bill.").

59.     Based on his experiences working at AKNC and observing the patterns of patients and providers, Relator believes that in many instances when AKNC billed for 12 hours of services like neuropsychological testing under CPT code 96118 (mentioned in the two emails above), its providers did not actually spend 12 hours testing their patients, but in fact only three or four hours. Relator believes that there are some days where the hours billed by AKNC providers exceeded 24 hours because of this strategy of overbilling.

60.     On February 15, 2016, Kathy Southerland wrote an email to Eli Lehrmann ("Lehrmann") asking for chart notes to accompany a claim on which she had changed the date of service for a claim that was **over a year old**, admitting that "I changed the date on this claim so I could get it paid":

US *EX REL.* FIDLER V. ALASKA NEUROLOGY CLINIC, LLC, CASE NO. _____

From: Kathy Southerland
Sent: Monday, February 15, 2016 4:13 PM
To: Eli Lehrmann
Subject: Chart notes

Hi Eli,

I changed the date on this claim so I could get it pd. It was orginally a 2014 claim. It is rqsting chart notes for this. Is it possible to get those?

Thank you,
Kathy

Later in the email thread, Lehrmann asked which payer was asking for this documentation, and, after Southerland replied that it was TRICARE, Lehrmann responded that he would have the chart notes for the false claim for in the morning:



US *EX REL.* FIDLER V. ALASKA NEUROLOGY CLINIC, LLC, CASE NO. _____

61.     On January 5, 2017, Paquin asked Lehrmann for help with rebilling a claim for two lidocaine injections AKNC had provided to a patient on January 14, 2016 and January 15, 2016.  Lehrmann instructed her to rebill the claim with a single date of service of January 31, 2016—over two weeks after the services were actually provided—because that was the "path of least resistance."



Eli Lehrmann 11:38 AM:
pay the 2 lines with dos 01/31/16
create a new claim
add a note
path of least resistance

62.     On January 14, 2016, Paquin wrote a message on AKNC's instant messaging service to Southerland asking for an explanation regarding a claim for a service provided on 07/15/15.  Southerland replied that the claim had been denied by Medicare for exceeding the daily maximum number of hours for the service, so she created a new claim for the next day and split the 12 units of the service over two days:



Shawna Paquin [1:20 PM]:
▉▉▉▉▉ ACCOUNT 1021207 DOS 07/15/15 CAN YOU REVIEW ACCOUNT BECAUSE TWO PAPER CORRECT CLAIMS PRINTED AND NOT SURE WHAT I SHOULD BE SENDING OUT
Kathy Southerland [1:21 PM]:
sure one sec.  I am on the phone with a rep regarding a claim :)
Shawna Paquin [1:21 PM]:
THANKS
Kathy Southerland [1:41 PM]:
OH SO HERE'S THE DEAL MEDICARE DENIED FOR FREQ.  SO ONE CLAIM SHOULD BE FOR 07/15/2015 6 UNITS AND THEN ONES SHOULD BE 07/16/2015 FOR 6 UNITS I SPLIT THE CLAIM

(highlighted portion reads: "OH SO HERE'S THE DEAL MEDICARE DENIED FOR FREQ. SO ONE CLAIM SHOULD BE FOR 07/15/2015 6 UNITS AND THEN ONES [sic] SHOULD BE 07/16/2015 FOR 6 UNITS I SPLIT THE CLAIM").

63.     On February 25, 2016, Lehrmann and Southerland had a conversation via instant message regarding billing problems.  Southerland reported that she had received a denial on a Medicare claim for three-dimensional processing with an MRI procedure (CPT code 76377) because it had been performed on the same day as another imaging procedure (CPT code 70547). Southerland and Lehrmann then agreed that the way to ensure that Medicare would pay for both services was to change the date of service of the CPT code 70547 procedure to the day after it had actually been performed, and Southerland confirmed that she resubmitted this false claim.

64.     One of the primary reasons that AKNC staff members are willing to create false claims by changing the dates of service (and changing other information on the claims, as discussed below) is because of the enormous pressure that senior AKNC management puts on the billing staff to ensure that all claims are paid.  On February 7, 2016, Lehrmann forwarded an email to Paquin in which Southerland had told Lehrmann that she was having difficulty getting a private insurer to pay some claims even though she had already tried fraudulently changing the date of service.  Rather than reprimanding Paquin for the fact that Southerland, one of her subordinates, admitted in writing that she had committed fraud, Lehrmann scolded Paquin for the failure to get the claims paid because it violated AKNC's "one rule" that "**ALL CLAIMS GET PAID**:"

> We have one rule here: **ALL CLAIMS GET PAID**. Your job is to facilitate that and if you can't, you need to come to me in a timely manner. You are waiting since Oct for a call back? You should have come to me before calling honestly, as I have contacts for all the network reps and can help deal with this.

### B.     Submitting Claims with False Procedure and Diagnosis Codes

65.     Similarly, AKNC regularly changes the CPT/ HCPCS code of a procedure, or the ICD-9 code used to diagnose a patient and justify the medical necessity of a treatment, after a

payer rejects a claim for that procedure or treatment. AKNC then resubmits the claim with falsified information to ensure that the claim is paid.

66. In other situations, AKNC has learned from the experience of having certain procedures and diagnoses rejected by government payers, that claims for certain procedures will not be paid by those payers and certain diagnosis codes will not be accepted to justify the medical necessity of certain procedures. In these cases, AKNC simply changes the procedure code used on the claim or the diagnosis code used to justify the procedure in the first instance, so that the first claim it submits for the procedure is false but nonetheless accepted by the payer.

67. This strategy was laid out explicitly by Lehrmann in a July 14, 2014 email to Richelle Donovan, Southerland, and Valerie Rodriguez about how AKNC would deal with billing issues for a particular provider, Dr. Sandra Mitchell (referred to by her initials SMM), for Medicaid and Medicare. Lehrmann wrote:

> Richelle/Kathy/Valerie-
>
> I have done some extensive research on some of the claim denial issues we have been having with Medicare/Medicaid and got the answers we need.
>
> I will try to catch/fix these during the initial process, but I might miss a few AND there are some out there pending now. I expect Richelle to correct all during posting and any she misses, Kathy catches and fixes during INSAGING, and lastly if we 3 miss it, Valerie will need to correct and resubmit during benefits.
>
> **MEDICAID – SMM**
> Only [CPT code] 96118 is a covered service for this Provider Type. So we convert all her other line items to this line item:
> 90791 =2 Units
> 96119 =1 Unit
> 99215 =2 Units
>
> Medicaid only allows 8 Units of 96118 per day, so if the total 96118 is > 8, the initial date is billed with 8 and then a new bill is created for the next day to include the remaining units.
>
> **MEDICARE – SMM**

Only 8 units per day are allowed, so same process as above, a new bill is created for the excess units and billed.

68.    In another case, Crystal Brown, who was no longer employed at AKNC but had previously worked in the billing department there, wrote an email to Dr. Ellenson on April 4, 2017 describing problematic experiences she had had with Lehrmann. In her email, Brown described the following situation where Lehrmann had instructed her to use a false diagnosis code for a Medicaid claim:

The next incident was a rejected Medicaid claim. The patient was seen in the hospital and had CAMA.[3] The diagnosis code used was rejected. Eli told me just to code it as epilepsy. I explained the patient did not have epilepsy or even any history of seizures. I found a different code that was relevant and was covered under CAMA in the patient's Providence chart and let Eli know. Eli told me, "Fine, you can try it, but I don't know if it will work. I know epilepsy will work." Additionally, when we calculated charges for patients coming in the next day, we only calculated level 5 visits no matter what the patient was being seen for or how complicated their care was. I no longer wanted to be involved with the fraudulent billing that Eli was committing. I had been deposed previously for another physician's billing practices before (which were much more minimal), and had little interest in going through that again.

69.    On January 4, 2016, Southerland wrote an email to Paquin asking her to "see if you can get this pd [sic]." The next day Paquin replied, explaining that she had changed the procedure code from J3490 to J1110 because Medicare and Medicaid would not pay for J3490 procedures.

_____

[3] I.e., Coverage through Alaska's Chronic & Acute Medical Assistance ("CAMA") program, which provides coverage for conditions related to terminal illness, cancer, diabetes, seizure disorder, chronic mental illness, and chronic hypertension.



**RE: Almost timely**

Shawna Paquin

Sent: Tue 1/5/2016 9:27 AM

To: Kathy Southerland

DONE, CHANGED TO J1110 PER ELI. MCARE/MCAID DON'T LIKE THE J3490 CODE.

Shawna Paquin
Billing Specialist

Alaska Neurology Center LLC
1100 E Dimond BLVD
Anchorage, AK 99515
P: 907-565-6000
F: 907-565-6001
w: www.aknc.com

This communication may contain privileged and/or confidential information. It is intended solely for the use of th
from disclosing, copying, distribution or using any of this information. If you received this communication in erro
entirety, whether electronic or hard copy. This communication may contain nonpublic personal information abou
directly or indirectly reuse or redisclose such information for any purpose other than to provide the services for v

Note to Patients regarding e-mail transmissions: Using the Internet- The Choice is Yours.

There are a number of risks you should consider before using email to communicate with us: email can be circula
be intercepted, altered, forwarded or used without authorization or detection; email senders can easily misaddres
email; employers and online services have the right to inspect email transmitted through their systems; email is e
to introduce viruses into computer systems. Confidentiality of Internet communications cannot be guaranteed by

---

**From:** Kathy Southerland
**Sent:** Monday, January 04, 2016 5:48 PM
**To:** Shawna Paquin
**Subject:** Almost timely

Hi Shawna,

Could you please see if you can get this pd. I appreciate it.

Thank you,
Kathy

Billing Specialist

## C. Submitting Claims with a False Provider of Services

70.     AKNC also changes the provider of services, especially when a provider is not yet approved by a certain government payer.

71.     In many cases, AKNC will change the provider of the services to Dr. Ellenson, who is often referred to by his initials, FEE.

72.     For instance, in the June 4, 2014 email referred to above in paragraph 57, Raquel Lehrmann gives instruction to Eli Lehrmann regarding a claim from October 16, 2013, that had been denied by Medicare because the provider, Dr. Mitchell, did not become authorized to

submit that kind claim until November 7, 2013. Raquel Lehrmann's solution was to resubmit the bill with Dr. Ellenson as the provider:



1009928--MEDICARE DENIED DOS 10/16/13 THIS PROVIDER IS NOT CERTIFIED/ELIG TO BE PD FOR THIS PROCEDURE/SERVICE ON THIS DOS. MEDICARE SHOWS SMM DID NOT BECOME EFFECTIVE UNTIL 11/07/13. I DID EMAIL RICHELLE AND RQSTED WHAT INFO WE HAVE ON FILE. **BILL UNDER FEE - DUE TO MEDICARE APPLICATION SUBMITTED LATE BY RICHELLE**

    73.    Dr. Mitchell evidently did secure her credentials at some point because she was later used as a false substitute for Dr. Gwendolyn Lander when Dr. Lander was not yet approved to bill to TRICARE. On April 4, 2017, when Emmy Sagato sent an instant message to Paquin asking whether Dr. Lander was approved to bill to TRICARE and Paquin replied in the negative, Sagato responded that she would fraudulently use Dr. Mitchell as the provider of services for the authorization she was seeking:



| From | : Emmy Sagato <emmy@AKNC.COM> |
| --- | --- |
| To | : Emmy Sagato; Shawna Paquin |
| Cc | : |
| Bcc | : |
| Subject | : Conversation with Emmy Sagato |
| Attachment(s) | : |

Emmy Sagato [10:32 AM]:
  MORNING!
  DO YOU KNOW IF LANDER IS GOOD TO BILL UNDER TRICARE?
Shawna Paquin [10:38 AM]:
  not that i know of yet
Emmy Sagato [10:38 AM]:
  OK SO THEN ILL STILL GET AUTH UNDER SMM

    74.    Dr. Mitchell quit working at AKNC in February, 2017. However, AKNC continued to falsely bill claims with Dr. Mitchell listed as the provider of services dozens of

times after the end of February, including in the instance discussed in the paragraph above.

Upon information and belief, the reason that AKNC billed claims with Dr. Mitchell listed as the

provider of the services after she had quit working at AKNC is, as is seen with the exchange

above in paragraph 73, there were other providers at AKNC (including those that replaced Dr.

Mitchell) who were not approved to bill to government payers but who nonetheless provided

services to patients covered by one of those programs.

75.     AKNC also submits false claims by fraudulently changing the referring physician

on the claim form.  In these cases, there either may not be a referring physician, or the actual

referring physician may not be approved to bill to the relevant government payer.   For instance,

in the July 14, 2014 email from Lehrmann described above in paragraph 67, Lehrmann also

explained to Donovan, Southerland, and Rodriguez that they should use Dr. Ellenson as the

"failsafe" referring physician if they did not have a referring physician for a given Medicare

claim:

> **MEDICARE – MRI/SLP/EEG**
>  Effective 01/01/2014, Medicare is now enforcing the Referring Provider rule and
> some Providers are either not Medicare Providers or not allowed to refer pts for
> any Dx studies.  In theory that should never be an issue, as its always one of our
> providers who orders the service.  The short answer to fix these, is just change the
> referring provider to FEE (failsafe) or the Patients Primary Provider here at
> AKNC (not PJO till he is approved again this month).

76.     Relator, who has been a patient at AKNC in his personal capacity,[4] has received

many Explanation of Benefits from procedures he has had performed at AKNC listing referring

physicians whom he had not seen in years and who had not referred him to AKNC for the service

that he received.

---

[4] Though Relator has private insurance, the fact that AKNC regularly submits claims with false
referring physicians shows AKNC's knowledge of how to submit such false claims, its proclivity
to do so, and a pattern in using false referring physicians.

23

US *EX REL.* FIDLER V. ALASKA NEUROLOGY CLINIC, LLC, CASE NO. _____
Case 3:18-cv-00057-HRH   Document 1   Filed 02/26/18   Page 25 of 37

D.    **Upcoding Massage to Physical Therapy**

77.    AKNC generates a significant amount of revenue from its Physical Therapy
("PT") Department.  One of the services provided in AKNC's PT department is massage.

78.    Government payers do not cover massage.  They do, however, cover physical
therapy.

79.    Starting in approximately 2014, AKNC began fraudulently billing out massage
services as physical therapy so that payers, including Medicare, Medicaid, and TRICARE, would
pay for them, even though, in many cases, they were performed by Bill Karaganis and Chris
Ferrell, neither of whom was licensed as a physical therapist.

80.    Jennifer Yates, who worked in the AKNC billing department from approximately
June, 2016 to June, 2017, was aware of this practice.  On December 20, 2017 she confirmed to
Relator that Lehrmann would regularly bill massage services to Medicare and Medicaid using
physical therapy codes (primarily the CPT code 97110).

81.    Suzanne Bradley, who was an administrator for the PT department from 2016 to
2017 and thus was familiar with its billing practices, confirmed to Relator on December 16, 2017
that "everyone" at AKNC knew that massages were being fraudulently billed as physical therapy
to ensure coverage.

82.    After AKNC began this fraudulent scheme in 2014, the PT department expanded
and brought in a great deal of revenue for AKNC—as much as $50,000 per month.

83.    However, in March, 2017, AKNC became concerned that it would be audited by
the State of Alaska.  It therefore set out to change some of its policies to hide the fraud it had
been practicing with regard to massage services.

84. On April 26, 2017, Paquin wrote an email to the AKNC staff informing them of a change in AKNC's policy for massage billing, effectively admitting the billing fraud that occurred prior to that date:

> Effective May 1st, massage therapy will no longer be covered by a majority of insurance companies. . . . When calling established patients to notify them of this change, we should tell them "there is an updated billing code that needs to be used for your services and this code is unfortunately not covered by your insurance. . . ." If patients question the coding issue, you can explain that "the old code no longer reflects the massage that was previously performed and we can no longer use that code."

85. There was, however, no change in either commercial insurance coverage or coverage through government payers for massages at this time.

86. Paquin's email was solely aimed at providing an excuse to AKNC's lower-level billing staff members and its patients as to why it would stop offering massages to patients who had been getting massages at AKNC paid for by their insurance providers.

87. AKNC has made no effort to self-report or return the revenue it generated from its false claims for massages under the procedures codes for physical therapy between 2014 and 2017.

**E.    Waiving Copays for Infusion Treatments**

88. Natalizumab is a drug administered through infusions for patients with Crohn's disease and multiple sclerosis marketed under the brand name Tysabri.

89. Tysabri is an expensive drug that can cost of over $20,000 per treatment and that, depending on the individual patient's policy, can require significant copayments.

90. To incentivize patients to come to AKNC, AKNC impermissibly waives its patient's obligation to pay any sort of copayment.

91.     Lehrmann announced this practice in an email to the billing department with the subject "Tysabri Patient-Policy."  In that email, sent on, Lehrmann told his staff not to send any charges to patients who receive Tysabri:



Subject     : Tysabri Patients - Policy
Attachment(s) :   image001.jpg

AKNC does not charge/balance bill any of the Tysabri Pts.

Each Patient will have a primary and/or secondary insurance and/or be part of the Tysabri COPAY and/or Tysabri INFUSION program.

Please work together to ensure the Ledgers are accurate and Pts are not charged inappropriately.

92.     A significant portion of AKNC's patients who receive Tysabri treatments are insured through a government payer. Medicare-insured patients have a 20% co-insurance payment requirement after their annual Medicare Part B deductible is met.

93.     Accordingly, waiving the required Medicare copayment for those AKNC's patients who receive Tysabri treatments constitutes a kickback. AKNC knowingly and willfully waived this copayment in an effort to induce its Medicare and Medicaid patients who needed Tysabri treatments to get them at AKNC.

**F.     Submitting Claims for Infusions Performed Without Physician Supervision**

94.     Under Alaska's State Medical Board's Guidelines, certain activities, including intravenous therapy ("IV therapy") are considered the practice of medicine.[5]

_____

[5] Alaska State Medical Board, Board Issued Guidelines: Delegating to Medical Assistants (Unlicensed Assistive Personnel), available at

95.     As such, IV therapy cannot be performed by a medical assistant except inasmuch as the medical assistant is directly supervised by a physician in performing a "routine duty." Under Alaska's rules, "[a] physician may only delegate routine duties; there is no provision for a physician to delegate clinical duties that are under their own scope of practice."

96.     A significant portion of AKNC's business is derived from infusions, which are a kind of IV therapy.

97.     Since at least 2012, AKNC has had no physician directly overseeing its infusions. Starting in June, 2017, AKNC did hire a registered nurse to assist with infusions, but there is still not direct physician supervision of the infusion practice.  In fact, in all the time that Relator was employed at AKNC, he never saw a physician so much as enter the premises where infusions were given to patients at AKNC.

98.     Complying with Alaska's State Medical Board's Guidelines by having a medical assistant directly supervised by a physician when administering IV therapy is material to decision of both the federal and Alaska state governments to pay for such IV therapy. *See, e.g., U.S. ex rel. Escobar v. Universal Health Services, Inc.*, 842 F.3d 103, 111 (1st Cir. 2016) (explaining that because "compliance with these regulations is central to the state's Medicaid program," compliance with those state regulations is also "material to the [federal] government's payment decision) (on remand from the Supreme Court).

## VI.     DEFENDANTS SUBMITS THE FALSE CLAIMS KNOWINGLY

99.     As discussed above in Section V, the whole thrust of AKNC's fraudulent schemes is to create false claims by changing the date of service, the provider of the service, the

---

https://www.commerce.alaska.gov/web/Portals/5/pub/MED_Guide_Delegating_to_Unlicensed_Assistants.pdf.

procedure code, or the diagnosis code because AKNC knew that the government payers would not pay the claim containing the factually accurate information.

100.    In some cases, AKNC knew on specific claims that the government payers had rejected its accurate claims, and so it resubmitted the claims with false information.

101.    In other cases, AKNC had learned that the government payers would not pay for certain types of claims and so it falsified the claims in the first instance to deceive the government payers into paying the claims.

102.    These fraudulent schemes are common practice throughout AKNC's billing department, with senior managers such as the Operations Manager and Billing Supervisor instructing their subordinates to create and submit false claims.

103.    Given the fact that one of AKNC's most common frauds is to falsely list Dr. Ellenson, the sole owner of AKNC, as the provider of services when the actual provider is not authorized to bill to a government payer, it is clear that the owner of AKNC is not only aware of, but condones its fraudulent schemes.

104.    AKNC has no compliance system in place to prevent false claims from being submitted because AKNC's official, explicit policy is to create false claims to ensure that it generates as much revenue as possible.

105.    The fact that AKNC knows that its practices are fraudulent is further evidenced by the fact that, when AKNC believed it was going to be audited, it changed its practices for billing massages as physical therapy and used fabrications about changes in insurance policies to cover-up its fraud to its staff and patients.

106.    Relator believes that Defendants' fraudulent practices have resulted in false claims being paid by government payers in the amount of at least one million dollars per year for each of the last ten years.

## VII.    DEFENDANTS KNOWINGLY FAIL TO REPORT AND RETURN OVERPAYMENTS TO THE GOVERNMENT

107.    Since March 23, 2010, 42 USC §1320a-7k(d) has required that a person receiving an overpayment must, within 60 days of identifying an overpayment, report and return the money and notify Medicare of the reason for the overpayment.  The 2010 amendments to the Medicare Act specifically made the failure to report and return overpayments enforceable under the False Claims Act (31 USC §3729(b)(3)) and applies the same broad definitions of "knowing" and "knowingly" as the FCA. *See* Section 1128J, as added March 23, 2010 by P.L. 111-148, Title VI, Subtitle E, §6402(a), 124 Stat. 753.

108.    Once a party becomes aware of an overpayment or a possibility of an overpayment, the party has an affirmative duty to investigate further the possibility that an overpayment occurred and, if an overpayment did occur, to notify and to repay the government.

109.    The fact that AKNC's accurate claims were denied and its false claims were paid put AKNC on notice that that the government had overpaid AKNC for the services actually rendered.

110.    AKNC was therefore required, at minimum, to undertake an investigation of these abusive practices and to report and to repay any overpayments.  AKNC had an obligation to do so, within the definition of 31 U.S.C. § 3729(A)(1)(G).  Instead, as detailed above, AKNC continued to submit false claims and refused to even consider returning any overpayments

because the explicit and intentional purpose of submitting the false claims was to bring in overpayments.

111.    AKNC thus knowingly concealed its obligation to repay government monies, and improperly avoided their said obligation, within the meaning of 31 U.S.C. § 3729(A)(1)(G).

## VIII.    DEFENDANTS' FALSE CLAIMS CAUSED INJURY AND DAMAGES TO THE GOVERNMENT

112.    Because AKNC presented its claims identified in Section V above ("the subject claims" and "the subject false claims") for payment, the federal government paid out monies on those claims to the State of Alaska and directly to AKNC.

113.    Because the subject claims were false, the federal government incurred injury and damages due to the payment of the subject claims, which were overpayments.

114.    Because the AKNC knowingly did not report or repay the said overpayments, and concealed them by not doing so, the federal government incurred injury and damages.

115.    But for the AKNC's misrepresentations and concealments regarding the subject false claims, the federal government would not have incurred the injury and damages it incurred due to the payment of the subject false claims.

## IX.    COUNTS

### A.    Count I, Violation of 31 U.S.C. § 3729(a)(1)(A)

116.    Relator repeats and re-alleges each and every allegation contained Paragraphs 1–115, inclusive, as though fully set forth herein.

117.    Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval. Defendants caused the State of Alaska to submit false and inflated claims to the United States for the federal portion of Medicaid when it submitted false

claims in violation of 31 U.S.C. §3729(a)(1)(A). Defendants directly submitted false and inflated claims to the United States through Medicare, TRICARE, and other government payers when it submitted false claims in violation of 31 U.S.C. §3729(a)(1)(A).

118. By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has incurred actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

B. **Count II, Violation of 31 U.S.C. § 3729(a)(1)(B)**

119. Relator repeats and re-alleges each and every allegation contained Paragraphs 1–118, inclusive, as though fully set forth herein.

120. Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government. Defendants' false records or statements on claims submissions caused the State of Alaska to submit false and inflated claims to the United States for the federal portion of Medicaid in violation of 31 U.S.C. §3729(a)(1)(B). Defendants' false records or statements on claims submissions to Medicare, TRICARE, and other government payers caused the submission of false and inflated claims to the United States in violation of 31 U.S.C. §3729(a)(1)(B)

121. By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

C. **Count III, Violation of 31 U.S.C. § 3729(a)(1)(G)**

122. Relator repeats and re-alleges each and every allegation contained Paragraphs 1–121, inclusive, as though fully set forth herein.

123.    Defendants knowingly made, used or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the government and/or knowingly conceals, avoids, decreases, concealed, avoided, and/or decreased an obligation to pay or transmit money to the government in violation of 31 U.S.C. §3729(a)(1)(G), when it did not return funds obtained from the federal government derived from false claims.

124.    By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## D.    Count IV, Violation of 31 U.S.C. § 3729(a)(1)(A) based on violations of the The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b

125.    Relator repeats and re-alleges each and every allegation contained Paragraphs 1–124, inclusive, as though fully set forth herein.

126.    Defendants knowingly and willfully engaged in illegal financial arrangements, including unlawful waiving of Medicare coinsurance payments, in violation of the Anti-Kickback Statute.

127.    Subsequently, the Defendants submitted or caused to be submitted claims for payments to Medicare programs.  Each of these claims – which were paid in whole or in part with federal funds – was accompanied by an express or implied certification that the underlying transaction was not in violation of federal and state statutes, regulations, or program rules.  Each of those certifications by the Defendants was false, because each claim for payment was tainted by kickbacks and by the violations of the laws, rules and regulations described in this Complaint. Accordingly, Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States in violation of 31 U.S.C. §3729(a)(1)(A).

128.    By reason of Defendants' false and fraudulent claims, the United States has been damaged, and continues to be damaged, and therefore is entitled to multiple, treble damages under the False Claims Act in an amount to be determined at trial, plus a civil per claim penalty in the maximum amount permitted by law for each violation.

### E.    Count IV, Violation of AS 09.58.010(a)

129.    Relator repeats and re-alleges each and every allegation contained in Paragraphs 1–128, inclusive, as though fully set forth herein.

130.    In violation of AS 09.58.010(a), Defendants knowingly submitted false claims to the State of Alaska for payment under the State's medical assistance program, knowingly used false records to get a false claim for payment approved by the State of Alaska under the State's medical assistance program, and knowingly created false records to conceal an obligation to pay money to the State's medical assistance program.

131.    By virtue of the false and fraudulent claims that Defendants caused to be presented, the State of Alaska has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## X.    PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and the State of Alaska, demands that judgment by entered in their favor and against Defendant Alaska Neurology Clinic, LLC and Defendant Dr. Frank Ellenson for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Twenty Two Thousand Three Hundred Sixty Three Dollars ($22,363.00) and no

less than Eleven Thousand One Hundred Eighty One Dollars ($11,181.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.[6]

This Request also includes, with respect to the Alaska statute cited above, the maximum damages permitted by that statute and the maximum fine or penalty permitted by that statute, and any other recoveries or relief provided for under that statute.

Further, Relator requests that he receive the maximum amount permitted by the law of the proceeds of this action or settlement of this action collected by the United States and the State of Alaska, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## XI.     DEMAND FOR JURY TRIAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 38(B)

A jury trial is demanded in this case.


/s/ Phillip Paul Weidner
Phillip Paul Weidner
Lisa Rosano
Phillip Paul Weidner & Associates, APC
Tel: (907) 277-7000

---

[6] Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 and 64 Fed. Reg. 47099, 47103 (Sept. 29, 1999), the civil monetary penalties under the FCA are $5,500 to $11,000 for violations occurring on or after September 29, 1999 but before November 2, 2015. *See* 28 C.F.R. § 85.3.

Pursuant to the Bipartisan Budget Act of 2015 and 83 Fed. Reg. 3944 (Jan. 29, 2018), the civil monetary penalties under the FCA were adjusted to $11,181 to $22,363 for violations occurring on or after November 2, 2015. *See* 28 C.F.R. § 85.5.

Fax: (907) 278-6571
Email: pweidner@weidnerjustice.com
Email: lrosano@weidnerjustice.com
*Attorneys for Relator*

Date: February 26, 2018